UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States<br><br>– against –<br><br>Ngomani Dekattu,<br><br>*Defendant.* | **1:18-CR-0474**<br><br>**Opinion & Order** |

ROSS, United States District Judge:

On August 30, 2018, the defendant in this case was indicted for unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g). *See* Indictment ¶ 1, ECF No. 7. On January 11, 2019, the defendant moved in advance of trial to suppress "tangible evidence seized as a result of Mr. Dekattu's stop and arrest, as well as all fruits of the illegal seizure" in addition to "statements obtained in violation of his Fifth Amendment rights." Notice of Mot. ¶ 1, ECF No. 26. The parties briefed the motion, and I held an evidentiary hearing on February 25, 2019. Decision was reserved while the parties submitted supplemental briefing. *See* Min. Entry, ECF No. 42. The motion is now ripe for disposition. For the following reasons, the defendant's motion is denied.

## BACKGROUND[1]

Shortly before midnight on August 2, 2018, the defendant and his nephew were walking home from the store when they were spotted by members of the New York City Police Department. Tr. 12:17–22, 18:5–8, 19:11–19, 68:22–69:13, 72:6–12, 74:2–9. NYPD Officers Ronnie Rivera and Joseph Bautista were sitting at a red light in an unmarked police car at the

---

[1] The following factual background is derived from testimony given and evidence, including audio and video recordings, introduced at the evidentiary hearing. I find the testimony cited herein credible except as otherwise indicated.

north side of the intersection of East 52nd Street and Clarkson Avenue in Brooklyn, in an area that Rivera testified was a "high crime area" with a "high" "level of firearms." Tr. 13:25–15:4, 35:1–7, 43:20–22. The officers were present as part of the department's Anti-Crime Team. Tr. 13:1–10. Their vehicle was unmarked, but Rivera, then riding in the passenger seat, was in uniform. Tr. 13:19–15:7. The front windows of the vehicle were not tinted, and Rivera testified that he was able to see across the intersection. Tr. 17:22–24, 24:10–13, 43:23–44:3. NYPD Sergeant Michael Scally and Officer Jose Villafane were behind them in a second car. Tr. 43:4–10.

While the officers waited at the red light, the defendant and his nephew rounded the corner from Clarkson onto East 52nd, heading south. Tr. 20:11–15, 23:3–24:3, 74:2–9.[2] According to Rivera, when the defendant turned the corner, he "kept looking back over his shoulder, and he was fixing his waistband area." Tr. 20:11–16.[3] At that time, Rivera testified, he and the defendant made eye contact. Tr. 23:8–24:8. Rivera also testified that he looked at the defendant's "waistband area" and there "appeared to be a bulge" there, which Rivera suspected to be "a firearm." Tr. 20:17–25. Rivera estimated that the bulge was about two or three inches long and that the defendant appeared to be adjusting it from the front of his waistband to the side. Tr. 21:21–22:24, 39:12–18.[4] At that point, Rivera testified, he and

---

[2] The defendant's nephew testified that as the two of them walked, he was on the "outside" of the sidewalk, suggesting that he was positioned between the street and the defendant. Tr. 73:6–74:12; *see also* Def. Ex. A-2, at 0:09–0:35. Even if I were to credit this testimony, however, it does not cast doubt on Rivera's ability to observe the defendant, as it fails to establish that the officer's line of sight to the defendant was obstructed for any significant period of time, if at all.

[3] The defendant's nephew testified that the defendant did not look over his shoulder (Tr. 74:18–22), but I credit Rivera's testimony in this instance.

[4] On cross-examination, Rivera estimated that he was "approximately two hundred feet" from the defendant at that point. Tr. 44:24–45:1. Earlier in the cross-examination, however, Rivera had indicated, on a satellite photo of the intersection, where both he and the defendant were located at the time. *See* Tr. 35:1–36:12, 45:2–6. The court's own examination of the photo, which was introduced into evidence, suggests that Rivera was in fact only about sixty feet from the defendant, and Rivera's estimate to the contrary is disregarded. *Cf.*

Bautista agreed that they would "approach" the defendant "and question him in reference to the bulge." Tr. 42:9–25.

As they walked down East 52nd Street, the defendant and his nephew briefly stopped and interacted with a group of people who were congregated outside of a rowhouse. Tr. 48:5–23, 75:1–76:10. After that interaction, they continued south on East 52nd. Tr. 76:11–15. Meanwhile, Rivera and Bautista had also continued south on East 52nd, in their vehicle. Tr. 23:3–7. Rivera testified that he then got out of the vehicle, approached the defendant on foot, and tried to engage him in conversation. Tr. 23:3–7, 24:19–22.[5] The defendant "became irate," however, retorting "that he did not want to talk" and that the officer should "get the fuck away." Tr. 24:19–25:4. The defendant and his nephew then continued to walk down the street. Tr. 25:10–13, 49:8–10, 78:4–6. Rivera got back into the vehicle, and the officers drove to the end of the block, ahead of the defendant. Tr. 25:10–17, 50:5–13.

As the defendant and his nephew neared the intersection of East 52nd Street and Lenox Road, Bautista, Rivera, and Villafane exited their vehicles and approached them. Tr. 26:3–18, 78:4–8; Def. Ex. A-2, at 0:34–0:49; Def. Ex. B, at 0:04–0:24. As the officers and the defendant walked toward each other, one of the officers called out, "where're you guys going?," to which the defendant shouted back, "we live right here; we're going home." Def.

---

*Dempsey v. Bucknell Univ.*, 834 F.3d 457, 481 (3d Cir. 2016) ("Estimates of time and distance of bystanders . . . are notoriously inaccurate, and entitled to little weight at best." (quoting *Martin v. Ill. Cent. R.R. Co.*, 23 F.2d 324, 325 (5th Cir. 1928))). "[T]he officer's testimony is not to be disregarded simply because his estimate of a distance which he did not measure was inaccurate." *Mason v. Triplett*, 141 A.2d 708, 711 (Md. 1958).

Admittedly, the two-inch size of the bulge beneath the defendant's shirt raises doubts regarding Rivera's ability to actually view it from across the street. But I have no difficulty crediting Rivera's testimony that he saw the defendant appearing to adjust something in his waistband and thus also credit his testimony that he suspected that he had seen an object hidden in the defendant's waistband. Further, I find this suspicion to be a reasonable one under the circumstances.

[5] The defendant's nephew, by contrast, testified that the police pulled up in a car and "said something" but did not get out of the car at that time. Tr. 78:1–12. I credit Rivera's testimony that he exited the car and approached the defendant in an effort to speak with him.

3

Ex. B, at 0:04–0:07. The defendant and Bautista then came to a stop, facing each other. *Id.* at 0:07–0:11; *see also* Tr. 27:5. At this point, the defendant was surrounded on three sides by Bautista, Rivera, and a fence. Def. Ex. A-2, at 0:46–0:54; Def. Ex. B, at 0:07–0:11. Bautista asked the defendant where he was coming from, and the defendant responded that he was coming from the store. Def. Ex. B, at 0:10–0:13. The two men then began to speak over each other, and Bautista told the defendant to "breathe" and "calm down." *Id.* at 0:18–0:24. The defendant then asked whether he could go home. *Id.* at 0:23–0:27. Bautista replied, "no, I gotta check you out," and reached out and placed his hand on the defendant's wrist. *Id.* at 0:26–0:33.

At this, the defendant became extremely agitated. *Id.* at 0:27–0:53; *see also* Tr. 27:6–8, 56:13–15. He began calling loudly for his sister, and bystanders began to gather. Tr. 51:5–15 60:12–15, 80:21–23; Def. Ex. A-3, at 0:00–0:19; Def. Ex. B, at 0:31–1:05. At this time, Scally walked up behind the defendant. *See* Def. Ex. A-2, at 0:49–1:25. The defendant continued to shout that the police were stopping him for no reason, and the defendant's sister, who had arrived on the scene, yelled at the defendant to calm down. Def. Ex. B, at 0:42–1:26; *see also* Tr. 66:1–3. After more back and forth between Bautista and the defendant, Bautista said again, "I'm gonna check you out," to which the defendant initially protested before saying, "I have a pocket knife on me." Def. Ex. B, at 1:25–1:57. The defendant then produced a knife. Tr. 27:15–28:1, 66:20–21, 82:19–83:1; Def. Ex. B, at 1:52–2:00. Rivera testified that he saw the knife and recognized it as a gravity knife. Tr. 27:25–28:11. Once the knife was produced, Scally called "ninety-two," a coded instruction to the officers to arrest the defendant. Tr. 28:12–29:1; Def. Ex. B, at 1:59–2:03. An alert bystander screamed, "they're gonna cuff you," and a struggle ensued. Def. Ex. B, at 2:07–2:33.

4

According to Rivera, as the officers struggled with the defendant, the officers and the defendant fell to the ground, at which point Rivera heard Scally shout that the defendant had thrown something underneath a parked car. Tr. 30:16–25. Rivera testified that Bautista then looked beneath the car and discovered a firearm. Tr. 31:1–5. According to Rivera, once the officers successfully handcuffed the defendant, he was placed "into a police vehicle immediately." Tr. 52:1–5. Ultimately, Rivera testified, the police recovered a second magazine of ammunition, consistent with the caliber of the firearm found underneath the vehicle, inside a pair of black gloves on the defendant's person. Tr. 31:9–32:6.

## DISCUSSION

"On a suppression motion, '[t]he Government bears the burden of proof as to establishing probable cause' or reasonable suspicion, as the case may be. The Government must make this showing 'by a preponderance of the evidence.'" *United States v. Goines*, 604 F. Supp. 2d 533, 539 (E.D.N.Y. 2009) (citation omitted) (first quoting *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008); then quoting *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)).

**A.  The officers lawfully stopped the defendant.**

"Under *Terry* [*v. Ohio*, 392 U.S. 1 (1968)], a police officer may briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). The officer's suspicion "must be both reasonable and articulable": "an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity is insufficient." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (quoting *Terry*, 392 U.S. at 27). That said, "'reasonable suspicion' is a less demanding

5

standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

In determining the legality of a *Terry* stop, the court considers "only 'the facts available to the officer at the moment of the seizure.'" *United States v. Bellamy*, 592 F. Supp. 2d 308, 315 (E.D.N.Y. 2009) (quoting *Terry*, 392 U.S. at 21–22). A seizure has occurred at the moment when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)). Yet "the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *Id.* at 317 (quoting *United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990)). For "a 'series of acts, each of them perhaps innocent in itself,' can when 'taken together warrant[] further investigation.'" *Padilla*, 548 F.3d at 187 (quoting *Terry*, 392 U.S. at 22).

Finally, the court must also consider "the degree of restraint imposed on the individual's freedom." *United States v. Streifel*, 665 F.2d 414, 421 (2d Cir. 1981). For if the officer's actions are "so intrusive as to be tantamount to an arrest," then *Terry* does not apply, and probable cause is required. *United States v. Ceballos*, 654 F.2d 177, 182–84 (2d Cir. 1981).

1. *The Initial Observation*

In this case, when Rivera first saw the defendant, the defendant was adjusting his waistband in a manner that suggested to Rivera that the defendant had a firearm hidden there. *See* Tr. 20:11–25. Then when the defendant saw the officers, he walked away from them while continuing to look back at them over his shoulder. *See* Tr. 23:8–15. These events transpired near midnight, in an area known for illegal firearm possession. *See* Tr. 13:25–14:16, 43:20–22.

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)). That a location is "a 'high crime area'" is, however, "among the relevant contextual considerations in a *Terry* analysis." *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 147–48 (1972)). Thus, while the defendant could not have been stopped simply for being on the street in a "high crime area" late at night, those facts are relevant to the officers' reasonable suspicion here. *See, e.g.*, *Padilla*, 548 F.3d at 189 (upholding finding of reasonable suspicion based in part on "the high-crime neighborhood"); *Muhammad*, 463 F.3d at 123 (upholding finding of reasonable suspicion based in part on "the location of [defendant] in a high crime area"); *United States v. Torres*, 252 F. Supp. 3d 229, 235 (S.D.N.Y. 2017) (finding reasonable suspicion based in part on defendant being "present in a high crime area late at night"); *cf. United States v. Blake*, No. 16-CR-0194 (MKB), 2017 WL 626603, at *4 (E.D.N.Y. Feb. 15, 2017) (finding reasonable suspicion based in part on defendant being "in a high-crime area with a group of individuals after 1:00 AM").

Moreover, the officers' suspicion in this case was heightened by the defendant's observed behavior. Courts have regularly found that physical movements indicative of carrying a concealed firearm can contribute to a finding of reasonable suspicion. *See, e.g.*, *Padilla*, 548 F.3d at 189 (upholding finding of reasonable suspicion based in part on "the apparent adjustment of a concealed firearm"); *United States v. Rodriguez*, 727 F. App'x 725, 728 (2d Cir. 2018) ("[Defendant's] body movement, coupled with the extensive testimony at the suppression hearing . . . about why such movement indicated that [defendant] had a gun, established reasonable suspicion for the stop-and-frisk."); *Blake*, 2017 WL 626603, at *4 (finding reasonable suspicion in part because officer "observed [defendant] shift an object from the side of his waist to the groin area of his sweatpants . . . and, based on [his] training

7

and experience, . . . believed [defendant] had a firearm"). Similarly, the Second Circuit has upheld a finding of reasonable suspicion based in part on a suspect "looking around nervously over his shoulders." *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992).

### 2. *Rivera's Approach*

Based on the above information, the officers did not immediately stop the defendant but instead decided to investigate further. *See* Tr. 42:9–25. They drove to where the defendant was walking, and Rivera exited the car, approached him on foot, and attempted to speak with him. *See* Tr. 23:3–7, 24:19–22, 49:6–10. Defendant did not converse with the officer nor did he simply walk away. Instead, he "became irate" and cursed at Rivera. Tr. 24:19–25:4.

There can be no doubt that when a police officer lacks sufficient cause to stop an individual, "the individual has a right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). But at the same time, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* at 124 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885; *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984); *United States v. Sokolow*, 490 U.S. 1, 8–9 (1989)). Although I recognize that there are "perfectly legitimate—and innocent—reasons" why an individual might object to being approached by the police (*Torres*, 252 F. Supp. 3d at 234; *see, e.g.*, *Ligon v. City of New York*, 925 F. Supp. 2d 478, 485 (S.D.N.Y. 2013) (observing that individuals stopped by police may "feel 'violated,' 'disrespected,' 'angry,' and 'defenseless'")), the defendant's emotional reaction to being approached by Rivera could also reasonably be construed as a manifestation of anxiety about being searched (*see, e.g.*, *United States v. Campbell*, 342 F. Supp. 3d 375, 390–91 (W.D.N.Y. 2018) (finding reasonable suspicion in part based on defendant's "irate and belligerent" reaction to being stopped), *appeal docketed*, No. 19-120 (2d Cir. Jan. 10, 2019)). *See also Padilla*, 548 F.3d at 187 ("Even conduct that is 'as consistent with innocence as with guilt may form

the basis for an investigative stop where there is some indication of possible illicit activity.'" (quoting *Villegas*, 928 F.2d at 516)). That is especially so in light of the defendant's previous repeated glancing over his shoulder when he first saw the officers. *See* Tr. 20:11–16, 23:13–15. The defendant's reaction, then, augmented the officers' suspicion "that criminal activity was afoot." *Muhammad*, 463 F.3d at 123.

### 3. *The Stop*

After the defendant walked away from Rivera, Rivera and Bautista drove ahead of the defendant and intercepted him at the end of the block. *See* Tr. 25:10–26:18, 49:8–10, 50:5–8, 78:3–6; Def. Ex. A-2, at 0:34–0:49; Def. Ex. B, at 0:04–0:24. The defendant, though clearly agitated or annoyed by the persistent officers, ultimately came to a stop when the officers approached him on the sidewalk. *See* Def. Ex. A-2, at 0:34–0:38; Def. Ex. B, at 0:01–0:09. After responding to a few initial questions, the defendant asked whether he was free to go, and Bautista told him that he was not. *See* Def. Ex. B, at 0:10–0:28. It was then that Bautista reached out and took hold of the defendant's wrist. *See id.* at 0:27–0:33.

"A seizure . . . requires '*either* physical force . . . *or*, where that is absent, *submission* to the assertion of [police] authority.'" *United States v. Huertas*, 864 F.3d 214, 216 (2d Cir. 2017) (alteration in original) (quoting *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005)), *cert. denied*, 138 S. Ct. 1985 (2018). In this case, I find that the defendant was seized when, having been approached by several officers, he was told that he could not go home and was physically held. *See, e.g., Goines*, 604 F. Supp. 2d at 540.

This seizure, however, constituted only a *Terry* stop, as "the degree of intrusiveness of the stop" was minimal (*Streifel*, 665 F.2d at 420). The officers' tactics were restrained: After they began to suspect that the defendant was carrying a weapon, Rivera alone approached the defendant. *See* Tr. 23:3–7. When the defendant rebuffed him, Rivera returned to his vehicle,

9

and the officers regrouped and reapproached the defendant after he had walked to the end of the block. *See* Tr. 25:10–26:18. Although the officers stopped the defendant, they did not yell at him, draw their weapons, or frisk him at any point before the defendant produced the knife. *See* Tr. 56:10–12, 66:11–67:4; Def. Ex. B, at 0:04–1:59. Where there is "no evidence of harassment, intimidation, physical restraint, humiliation or prolonged questioning," reasonable suspicion, not probable cause, is all that is required. *United States v. Vasquez*, 612 F.2d 1338, 1343 (2d Cir. 1979).

I find that reasonable suspicion was present here. "Reasonable suspicion is so fact-intensive that on-point precedent to control the outcome of a case will typically be nearly impossible to find." *United States v. Strachon*, No. 18-CR-0002 (CM), 2018 WL 6985232, at *9 (S.D.N.Y. Dec. 14, 2018) (quoting *United States v. Jackson*, No. 15-CR-0106 (JPO), 2015 WL 4557401, at *8 (S.D.N.Y. July 29, 2015)). As a result, the court's "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Here, the defendant was observed, at night, in a "high crime area," behaving nervously and appearing to carry a concealed firearm, and when the police approached him, he reacted in an agitated and evasive manner. *See supra* pp. 1–4. Any one or two of these facts "alone might not be enough to support a finding of reasonable, particularized suspicion" (*Torres*, 252 F. Supp. 3d at 235; *see also Floyd v. City of New York*, 861 F. Supp. 2d 274, 298 (S.D.N.Y. 2012) ("[S]imply being in a high crime area at night is not suspicious behavior."); *Bellamy*, 592 F. Supp. 2d at 318 ("[F]urtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion.")), but I find that "together they serve as facts sufficient to cross the threshold of reasonable suspicion to justify a stop" (*Torres*, 252 F. Supp. 3d at 235; *see also United States v. Gonzalez*, 111 F. Supp. 3d 416, 430 n.10 (S.D.N.Y. 2015) ("This case is . . . far afield from those in which courts have

found that the mere fact of 'a generic bulge in a pocket' without more, does not supply reasonable suspicion for a stop . . . ." (quoting *Singleton v. United States*, 998 A.2d 295, 302 (D.C. 2010)))). The defendant's stop was lawful.

**B.     All the evidence at issue is admissible.**

   *1.  The Physical Evidence*

With regard to the physical evidence at issue, the defendant's motion relies entirely on the argument that the stop of the defendant was unconstitutional and that all the evidence is thus fruit of the poisonous tree. *See, e.g.*, Def.'s Suppl. Br. 7, ECF No. 41. Because I find that the stop itself was proper, none of the evidence need be suppressed.

The gravity knife was voluntarily produced by the defendant after he had been seized, but before he was frisked, arrested, or searched. *See* Tr. 27:15–28:8, 66:20–21, 82:19–83:1; Gov't Ex. 3; Def. Ex. B, at 0:26–1:59. Because possession of a gravity knife is a misdemeanor under New York law (*see* N.Y. Penal Law § 265.01(1)), the defendant's production of the knife gave the officers probable cause to arrest him. And the gun and ammunition were recovered as a direct result of the arrest. *See* Tr. 30:16–31:17. There are thus no grounds to suppress any of the physical evidence in this case.

   *2.  The Defendant's Statements*

In addition to his fruit-of-the-poisonous-tree argument, the defendant also argues that two statements that he made should be suppressed because he was never advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). *See* Def.'s Br. 4, ECF No. 26-2.

*Miranda* warnings are required "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Whether an individual is "in custody" for purposes of *Miranda* is a separate question from whether that individual has been seized under the Fourth Amendment. *United States v.*

*Newton*, 369 F.3d 659, 673 (2d Cir. 2004) (citing *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995)). *Miranda* warnings are required only when "a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *Id.* (quoting *Ali*, 68 F.3d at 1472). And even when an individual is in custody, *Miranda* warnings are required only before "interrogation"—i.e., "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnote omitted).

The first statement that the defendant seeks to suppress is his statement to Bautista that he had a knife on his person. *See* Def.'s Br. 4. At the time the statement was made, the defendant had been stopped by four police officers on a public street for only about a minute and a half. *See* Def. Ex. B, at 0:26–1:52. The defendant was not in handcuffs, and the officers had not drawn their weapons, or even raised their voices. *See id.*; Tr. 56:1–12, 66:14–24. In short, the defendant had been subjected to a minimally intrusive, run-of-the-mill *Terry* stop, but nothing more. That does not amount to custody for purposes of *Miranda*. *See Cruz v. Miller*, 255 F.3d 77, 83–84 (2d Cir. 2001) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984)).

The second statement at issue—"that the police 'dropped' a gun on him"—"was made while Mr. Dekattu was handcuffed and was in the back of a police car." Def.'s Br. 4. At this point, the defendant had in fact been arrested, and thus he was clearly "in custody" (*Innis*, 446 U.S. at 300). The defendant, however, does not offer evidence or even argue that he was being "subjected to either express questioning or its functional equivalent" when he made the statement (*id.* at 300–01). I thus find that the statement was not elicited through interrogation.[6]

---

[6] Although the defendant asserts in his brief that "the officers were speaking to [him]" (Def.'s Br. 4), review of Scally's bodycam footage, which the defendant provided to the court, confirms that the defendant was not being spoken to, and was certainly not being interrogated, when he began to accuse the officers of "dropp[ing] a gun on [him]."

Because neither statement was the product of custodial interrogation, *Miranda* warnings were not required, and the statements will not be suppressed.

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is denied.

So ordered.

                                                  ____/s/_____
                                                  Allyne R. Ross
                                                  United States District Judge

Dated:        March 8, 2019
                Brooklyn, New York